UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  <br>  )  <br>    Plaintiff,  )  <br>  )  <br>v.  )  <br>  )  <br>GLENNIS KODY NANTZ,  )  <br>  )  <br>    Defendant.  ) | No. 6:20-CR-2-REW  <br><br>**OPINION & ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Kody Nantz[1] asks the Court to suppress evidence seized on December 12, 2019, during execution of a search warrant at his residence (75 Little Current Trail) in Whitley County, Kentucky. DE 168 (Motion); *see also* DE 168-1 (Mem. in Support). Nantz, building on the warrant challenge, further argues that post-search incriminating statements (his own, and those of his girlfriend, Megan Dople) and evidence gleaned from his cell phone via a mid-interview consent search are excludable fruits.

The matter—now fully briefed, *see* DE 175 (Response); DE 200 (Reply)—stands ripe for decision. The Court, on review of the apt record (the briefs, the warrant, and the subject affidavit)[2] and applicable law, **DENIES** the motion. The affidavit undisputedly provided probable cause to believe that Kody was dealing meth. In context, search

---

[1] Glennis Reed Nantz is Glennis Kody Nantz's father and co-Defendant. For simplicity (and consistent with the parties' treatment), the Court refers to the elder Nantz as Glennis and his son, the movant, as Kody. The operative indictment charges both Nantzes (and 10 other co-Defendants) with conspiring, between December 2018 and December 13, 2019, to distribute 500+ grams of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 846 & 841(a)(1). DE 211 (Superseding Indictment – Count 1). The charged conduct allegedly occurred in Whitley, Laurel, and Knox counties in this District and elsewhere. *Id.*

[2] *See* DE 228 at 1–5 (hereinafter "Aff.").

1

validity hinges on whether the affidavit provided a sufficient basis, beyond Kody's status as a trafficker, to connect Defendant's residence with evidence of dealing activity. The Court—under the applicable pliant, commonsense, and deferential standard of review—finds sufficient linking indicia and thus upholds the warrant. Careful adherence to Circuit cases is a part of this exercise.

The probable cause question is, at a minimum, exceptionally close. In this grey area, the Court alternatively finds that even if the affidavit failed to cross the probable cause nexus threshold, law enforcement's reliance on Judge Prewitt's rational assessment of the presented papers showed no deliberate or otherwise culpable misconduct to deter via the costly act of suppression. In short, the substantial bases in the application both validate the issuance and surely demonstrate that the searching officers' warrant reliance was reasonable, thus insulating the seized evidence from exclusion under *Leon*.[3] Under

---

[3] *United States v. Leon*, 104 S. Ct. 3405 (1984).

either rationale, the Court's conclusion on the initial search forecloses the derivative suppression theory.[4] Accordingly, the Court fully denies the motion.

I.   **BACKGROUND**

Per Corbin Police Detective Glenn Taylor's affidavit, law enforcement arrested Angelia Hammons on November 5, 2019, after finding her in possession of 112 grams of suspected meth. In a post-arrest interview, Hammons inculpated herself as "routinely receiving large quantities of methamphetamine from" a Georgia source of supply. Aff. at 4. She identified Glennis and Kody Nantz as pound-level, repeat purchasers from her. The next day, November 6, 2019, Corbin PD executed a search warrant at Glennis's Knox County residence. Officers seized 140 grams of evident methamphetamine and two firearms, but Glennis was absent. Just over a month later, on December 11, 2019, law enforcement executed a second search warrant at the same location, seized another 169 grams of suspected meth, and apprehended Glennis.

---

[4] The parties do not substantively grapple with the interplay between the good-faith exception and the fruit of the poisonous tree doctrine. The Court finds that excluding fruits of a good-faith search (one upheld despite warrant invalidity) would be wholly inconsistent with the principles undergirding the good-faith exception and the purposes of the exclusionary rule. *See United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) ("[T]he Supreme Court has [ ] emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred."); *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) ("Because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the exclusionary rule" to the subsequent search.). Suppressing direct products of an invalid warrant executed in good faith does not (as *Leon* held) justifiably vindicate the deterrence interests that animate the remedy. The Court sees no reasoned basis for finding any increased likelihood of discouraging misconduct via exclusion of fruits more logically and factually detached—particularly when, as here, there is no suggestion of impropriety linked to the later-acquired proof.

During a post-*Miranda* interview with ATF Special Agent Todd Tremaine and Corbin PD, Glennis confirmed Hammons as one of his suppliers (and demonstrated knowledge of Hammons's own extant sources), identified no less than four alternative meth sources, named numerous customers (information that was, intra-affidavit, strongly corroborated), and—most importantly, for present purposes—gave extensive, detailed information regarding his son, Kody. Glennis depicted Kody as his "partner" in a lengthy, pound-quantity meth trafficking operation. Indeed, Glennis described the team as currently using two meth sources in Louisville, with Kody acting as primary contact for one of the suppliers. Glennis, as to Kody, provided inculpating specifics, including multiple text and Facebook messages (from Glennis's phone) and a December 7, 2019, receipt for a wire transfer to Kody in Louisville (per Glennis, Kody used the funds to purchase meth from the supplier for which Kody was the "main point of contact"). Aff. at 4.

Nantz does not question the reliability of any affidavit information or argue staleness. Nonetheless, the Court notes that the content is detailed, corroborated (often on multiple bases), and fresh. Glennis advised of a planned trip to a Louisville source for December 13, 2019, the day after issuance and execution of the challenged warrant. The Glennis/Kody communications (including the substantiating wire-transfer receipt) showed that the last supply run happened only 5 days prior to the search. The pair was highly active in the immediate temporal period.

Finally, Glennis told officers that Kody (again, his son) "lived in the Tattersall community of Whitley County with his girlfriend Megan." Aff. at 5. Based on Glennis's directions, SA Tremaine arrived at 75 Little Current Trail where he found a vehicle in the

4

driveway registered to Megan Dople. Det. Taylor swore that he, through independent investigation, "confirmed that Kody Nantz's girlfriend does live at 72 Little Current Trail, consistent"[5] with the information Glennis supplied. Aff. at 2.

Based on Taylor's sworn information, Whitley District Court Judge Cathy Prewitt issued a warrant for Kody's residence on December 12, 2019, which officers executed the same day.[6]

## II. DISCUSSION

### Warrant Validity

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found **in a particular place**." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted) (emphasis added). A supporting affidavit must, therefore, sufficiently demonstrate the

---

[5] The "72" designation appears to be a typo. The affidavit otherwise consistently refers to the subject address as "75 Little Current Trail." Aff. at 1, 5. Defendant does not mention this scrivener's error, much less argue any suppression-relevant inference. The Court finds no substantive import in the cosmetic discrepancy. The full application leaves no doubt as to the address Det. Taylor intended to reference.

[6] Because warrant validity is determined via four-corners analysis, and Defendant's challenge to subsequently obtained evidence hinges on the success or failure of the warrant challenge, the Court ends its background summary here. The search yielded contraband and Kody later made statements; search probity is the key prologue.

5

existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing judge's determination. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). Such deference ensures that "an issuing [judge's] discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). The reviewing court must uphold the issuing judge's probable cause determination if a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 103 S. Ct. 2317, 2331 (1983); *Allen*, 211 F.3d at 973. Additionally, line-by-line scrutiny of a supporting affidavit is inappropriate, *Jackson*, 470 F.3d at 306 (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)), and a reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." *Id.*; *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). When the search at issue occurred pursuant to a warrant, the defendant has the burden of establishing a prima facie case indicating that the search was illegal. *United States v. Murrie*, 534 F.2d 695, 697–98 (6th Cir. 1976); *see also United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008) (Clay, J., dissenting). The Court examines the affidavit at issue through a prism of common sense. *Gates*, 103 S. Ct. at 2331, 2333.

Defendant specifically argues that the affidavit failed to establish an adequate nexus between evidence of illegal activity and the search target, 75 Little Current Trail.

6

Recently, the Sixth Circuit held, in analogous circumstances, that a valid warrant requires an affidavit demonstrating probable cause as to three components:

> (1) that [Defendant] was trafficking drugs; (2) that [Defendant] lived at the [searched] residence; and (3) that evidence of drug trafficking would be found at [the] residence.

*United States v. Sumlin*, 956 F.3d 879, 885 (6th Cir. 2020). Nantz does not dispute, and the Court easily finds, that the affidavit supplied probable cause to believe Defendant was a trafficker and lived at 75 Little Current Trail. A substantial basis exists for each requirement

As to the final, challenged component, the Circuit has acknowledged that its cases exhibit a "struggle[ ] to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that evidence will be found at the individual's residence." *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1611 (2019). On the one hand, earlier cases generally held that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009); *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (citing cases). Defendant, however, relies on the Circuit's subsequent clarification that "a suspect's status as a drug dealer, **standing alone**, [does not] give[ ] rise to a fair probability that drugs will be found in his home." *See United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (internal quotation marks omitted) (emphasis added). The Court has blazed this path before. *See United States v. Barron*, No. 5:17-CR-101-DCR-REW, 2017 WL 5165963, at *4–8 (E.D. Ky. Oct. 12, 2017), *report and recommendation adopted*, 2017 WL 5160687 (E.D. Ky. Nov. 7, 2017).

7

*Brown* notwithstanding, the core analysis remains unchanged. At bottom, to "establish probable cause necessary for [a] search warrant, the supporting affidavit must set forth a nexus between the place to be searched and the evidence sought. . . . The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er], there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Penney*, 576 F.3d at 311 (internal quotation marks, alteration, and citations removed). Here, the Court finds at least three affidavit-substantiated bases justifying probable cause to believe that a search of 75 Little Current Trail would unearth evidence of drug trafficking.

*First*—Despite *Brown*'s call for proof beyond mere dealer "status," the panel acknowledged the reasoning of prior, published Circuit decisions finding that information indicating a suspect ranks as a "major player[ ] in a large, ongoing drug trafficking operation" can fill the inferential gap left by the absence of direct residence-nexus proof. 828 F.3d at 383 n.2 (collecting cases). This is consistent with *Brown*'s dealer-status-plus framework. A key participant in an expansive, continuing distribution scheme is not merely a run-of-the-mill dealer. It also fits neatly with the broader idea that a "magistrate may infer that the evidence sought is likely to be found in the criminal's residence based on the type of crime being investigated, the nature of the things to be seized and the normal inferences that may be drawn as to likely hiding places," and builds on the background concept that, absent contrary evidence, it is generally "reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.) (internal quotation marks and alterations omitted), *cert. denied*, 139 S. Ct. 108

(2018). "[W]hen drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor." *Id.* at 273. Thus, the inference of residential storage (based on status alone) is far weaker for a small-scale trafficking conspirator, a minor participant in a larger scheme, or a party to a concluded conspiracy. By contrast, a major player in an ongoing, high-quantity operation is logically likely to maintain more illicit inventory than one or multiple discrete distributive acts would exhaust. Again, commonsense and totality are watchwords in judging probable cause.

Here, Glennis characterized Kody as his "partner" in a multi-pound, persisting meth-distribution organization. Aff. at 4. Glennis also described Kody as the "main point of contact" for one of the organization's two active Louisville sources. *Id.* Facebook messages indicated that Kody's portion of the operation necessitated "one or two" pounds of meth—to Det. Taylor, based on his training and experience—less than two weeks prior to warrant issuance. *Id.* at 5. A wire transfer happened on December 7. Glennis had a large quantity in hand on December 11, with a Louisville trip slated for December 13. Judge Prewitt had ample grounds to believe Kody was a "major" conspiracy player.

The Nantzes' partnership was hardly small potatoes. Angelia Hammons advised law enforcement that she sold the Nantzes pound quantities on multiple occasions—a statement strongly corroborated by the fact that it followed her arrest in possession of a hefty (112 gram) quantity of meth and that the representation, itself, implicated Hammons in further trafficking activity. In addition to Hammons, Glennis identified two other historical sources of supply, on top of the Nantzes' then-current Louisville suppliers. Glennis supplied a purchaser he named, Jerry Caldwell, with "large quantities

9

of methamphetamine on a consistent basis in the past few months." Aff. at 4. The Affidavit undoubtedly depicted the Nantzes' operation as large-scale.

Nothing in the affidavit suggests a concluded scheme or an operation on its last legs. Quite the opposite, in December 2019, the Nantzes were trafficking full bore. Five days before the search, on December 7, (and only a week after Glennis evidently received a shipment, *see* Aff. at 5 ("I just got up")) Kody was in Louisville purchasing additional meth. The day before the search, Glennis held 169 grams of (likely) meth at his residence. Despite the already significant weight in his possession, Glennis planned a trip to Louisville to purchase additional meth just two days later (on December 13, 2019). The scheme was, on substantiated affidavit bases, robust and ongoing.

In sum, the affidavit provided ample grounds to believe that Kody was co-leader of or partner in a multi-pound, continuing, and immediately active meth trafficking conspiracy. Those facts—combined with the well-corroborated (and unchallenged) indications that Kody lived at the subject residence—provide probable cause to believe trafficking evidence would be found at 75 Little Current Trail and thus validate the warrant. *See Brown*, 828 F.3d at 383 n.2; *see also United States v. Davis*, 751 F. App'x 889, 891–92 (6th Cir. 2018) (finding that a "magistrate could have inferred that [Defendant] used his home to store drugs or other relevant evidence" based on affidavit stating: "Ohio police had just discovered a large quantity of drugs in [Defendant's] SUV; a confidential informant had recently identified [Defendant] as a 'large scale heroin dealer in the Akron area'; and the Drug Enforcement Administration had previously seized large sums of money from [Defendant] as drug proceeds").

*Second*—The affidavit provided other good reasons, beyond Kody's leading role and the conspiracy's scale, to believe officers would find meth, specifically, at the searched residence. *Cf. Peffer*, 880 F.3d at 270 ("The requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear."). The volume of the meth the Nantzes moved, the numerosity of their sources, the frequency with which Glennis and Kody resupplied their meth stock, and their persistence in securing new suppliers (and thus a consistent stream of contraband) when others were lost strongly indicate that each would, at any given time, be in possession of meth. And, there is the recognized general idea that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking[.]" *Williams*, 544 F.3d at 687. Here, the affidavit provided particularized grounds to believe that Kody, in specific case context, likely stored his drugs at his home. His father and trafficking partner's conduct showed that residential storage was the favored procedure for the meth-dealing family business. The Corbin Police Department seized aggravated meth quantities during execution of not one but two search warrants at Glennis's home. Undeterred by the first seizure, Glennis possessed 169 grams at his residence the day before Judge Prewitt issued the warrant for Kody's home. The text discussion suggests that each had distinct needs and that each held stock—this directly supports an inference of residential storage, which is just what Glennis did.

Also important is what the affidavit does *not* show. There is absolutely no indication that the partnership had a stash house where the partners might keep contraband to divorce themselves from their illicit activities. Indeed, if the Nantzes maintained off-site storage, surely Glennis, if not unvaryingly keeping his meth in that

location, would have socked away his supply after Corbin PD seized 140 grams from his home on November 6, 2019. Instead, the affidavit shows that Glennis persisted with in-residence storage until his arrest the day before the raid at his son's home. [The Court also finds Glennis's directions a lightly corroborative nexus indicator. Having just identified Kody as his partner in a meth trafficking scheme,[7] and obviously speaking to law enforcement about precisely that topic, Glennis directed law enforcement not to Louisville, or to an off-site location, but to Kody's residence.]

A reviewing judge may make the inferences common sense supports. *See, e.g., United States v. DeFoggi*, 839 F.3d 701, 706 (8th Cir. 2016) ("We 'may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.'") (citation omitted); *cf. United States v. White*, 874 F.3d 490, 502 (6th Cir. 2017) (commenting, in good faith context, "a reviewing court must read the affidavit reasonably[,] . . . employing a healthy dose of common sense[;] . . . [i]f an inference is obvious from the factual context, a reviewing court should indulge it") (internal citations omitted). Here, one such inference is that Kody, Glennis's son and trafficking partner, would follow his father's lead and store drugs in his home.

*Third*—Critically, the warrant's validity does not hinge on the affidavit providing probable cause to believe that <u>drugs</u> would be found in Kody's home (though the Court, for the reasons discussed, has found that it did). That was *Brown*'s focus, and the central concern of the parties' briefing. *See* 828 F.3d at 383 (noting that the Circuit has never held that dealer status, alone, supports a "fair probability that **drugs** will be found"

---

[7] Clearly, at this stage, Glennis was being forthcoming. If there was any information he intended to withhold, it is difficult to envision what would take primacy over his own son's involvement as a DTO principal.

12

(emphasis added)). The probability of drug-discovery is only one option for satisfying a broader predicate: "[T]he affidavit must suggest that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime." *Peffer*, 880 F.3d at 270 (quoting *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)). Relevant here, the challenged warrant authorized search for and seizure of "computers and cell phones containing" trafficking evidence. DE 228 at 1–2. The affidavit provided significant grounds to believe such evidence would be found at Kody's home.[8]

Det. Taylor, as affiant, discussed numerous drug-related communications, "both Facebook Messenger and text," between Glennis and Kody found on and reviewed from the former's phone. Aff. at 5. The affidavit particularly describes the contents of several messages, including "a receipt for a wire transfer of cash that was sent to" Kody in Louisville to fund a meth purchase, that confirm their incriminating nature. *Id.* These messages abundantly supply reasons to believe that Kody's phone (for the text messages) and/or computer[9] contained evidence of drug trafficking. Per the Circuit, "[u]nlike drugs, guns and computers are objects that generally remain in the suspect's possession after commission of the crime, and therefore it is reasonable to believe those possessions to be stored at the suspect's residence, absent evidence to the contrary." *Peffer*, 880 F.3d at 273. The same logic rationally applies to a cellphone used in the commission of crime. The affidavit certainly presents nothing suggesting that the Nantzes were in the habit of

---

[8] Including "receipts of money transfers[.]" Aff. at 1.
[9] Though the Facebook messages might have been generated through a phone, surely there is a fair probability that the incriminating correspondence was composed on, or, at minimum, accessible through, a personal computer.

13

discarding their cellphones or deleting incriminating messages. To the contrary, Glennis's phone (located at his residence on execution of the search warrant or, as a fair inference, on his person while inside his residence prior to his arrest) revealed "hundreds" of illicit messages dating back, at least, to November 30, 2019. Aff. at 5.

As the Sixth Circuit has put it, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Allen*, 211 F.3d at 975. The inquiry is holistic, pragmatic, and case specific. *United States v. Christian*, 925 F.3d 305, 309–10 (6th Cir.), *cert. denied*, 140 S. Ct. 414 (2019). Viewing the affidavit through the requisite "lens of common sense," the Court finds there was probable cause to believe that a search of 75 Little Current Trail "would uncover evidence of drug trafficking. Most readers of the affidavit would have been surprised if it did not." *Id.* (internal quotation marks omitted)

### The *Leon* Good-Faith Exception

"Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). The *Leon* good-faith exception sets the exclusionary hurdle still lower. *Christian*, 925 F.3d at 312 ("Under *Leon*, the exclusionary rule does not bar from admission evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." (internal quotation marks omitted)). For a challenge like Nantz's, the Sixth Circuit has explained:

> Good-faith reliance on an affidavit under *Leon* needs a "minimally sufficient nexus" between the site of the search and the evidence sought. *Carpenter*, 360 F.3d at 596. And it is not entirely unreasonable for an officer to infer a connection between evidence of drug trafficking and a drug dealer's home. *See, e.g.*, [*United States v. Gunter*, 551 F.3d 472, 481–82 (6th Cir. 2009)]. All that's required in the *Leon* context are facts that show a nexus and that are not "so vague as to be conclusory or

14

> meaningless," *Carpenter*, 360 F.3d at 596—all less than what's needed to show probable cause.

*Ardd*, 911 F.3d at 351.

Even if the affidavit did not establish probable cause (though, for all of the reasons discussed, that Court finds that it did), given the significant factual detail and strong reliability corroborating indicia, it was certainly more than "bare bones." *See Christian*, 925 F.3d at 312 ("We reserve that label for an affidavit that merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." (quotation marks omitted)). The Affidavit shows that Kody co-led a large-scale trafficking scheme "with continual and ongoing operations"; in that circumstance, officers may reasonably infer that "drug contraband is likely to be found in the drug dealer's home." *United States v. McCoy*, 905 F.3d 409, 421 (6th Cir. 2018).

The *Frazier* panel found, in the good-faith context, that a "reasonably well-trained officer could infer that a drug dealer who kept drugs in his former home would also keep drugs in his current home." 423 F.3d at 537. Here, the affidavit shows that Glennis, not Kody, stored drugs in his home. However, this difference hardly makes the connective "evidence in the affidavit . . . conclusory or meaningless." *Id.* at 536 (quotation marks omitted). Again, Glennis was Kody's father and partner in the specific trafficking scheme, and Glennis's adherence to the in-home storage model was strong enough that it persisted even after law enforcement first seized meth from his home. A reasonable officer could surely infer that the right-hand-man and son of one so committed to in-residence drug stowing would follow that example.

Applying the good-faith exception in *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994), the Circuit "held that an officer reasonably relied on a warrant authorizing the search of a bank safety deposit box where the affidavit underlying the warrant connected the box and the defendant's drug trafficking only by stating that the officer's training and experience led him to believe that evidence would be located there." *Frazier*, 423 F.3d at 536–37 (characterizing *Schultz*). Det. Taylor expressly swore that he had "17 years" of experience (and, as a fair inference, training) with the Corbin Police Department and directly averred a belief that "controlled substances, records relating to . . . purchase . . . of controlled substances[,] . . . and computers and cell phones containing" trafficking evidence were "now on the premises" of 75 Little Current Trail. *See* Aff. at 1. The defense criticizes Taylor's failure to explicitly connect his identified experience (or training) to his represented belief concerning the presence of evidence. To be sure, the affidavit did not explicitly draw that line (leaving a gap that logic and common sense could fill by inference). Yet, that lone blemish does not undercut good faith. *See White*, 874 F.3d at 503 ("Yes, the affidavit could have said all of the things that the dissent notes are 'missing' . . . [, b]ut the dissent's glass-half-full, divide-and-conquer approach is not how we read affidavits for purposes of the good-faith exception.") (internal citations omitted).

The Circuit has "said that a minimally sufficient nexus exists if the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. Tucker*, 742 F. App'x 994, 999 (6th Cir. 2018) (quotation marks and alterations omitted). The Court, for

all the reasons discussed, finds numerous facts logically and empirically tethering evidence of Kody's trafficking to his residence. Nantz makes no tenable claim that Taylor's warrant application displayed deliberate, reckless, or grossly negligent disregard for Defendant's Fourth Amendment rights. Indeed, all the evidence indicates that the affiant acted with an objectively reasonable, good-faith belief that his conduct was lawful. A neutral judge, evaluating a detailed application with input from multiple officers, found probable cause. Accordingly, and though the Court finds the warrant validly issued, the *Leon* exception also forecloses the remedy sought. Given the applicant's role and the detached judge's responsible handling, there is no whiff of misconduct or blameworthy behavior by police that suppression must redress.

### Derivative Evidence

Because the Court finds no Fourth Amendment violation, it undertakes no attenuation analysis and rejects Defendant's challenge to the alleged search fruits. Alternatively, application of the good-faith exception likewise shuts the door on the exclusionary request. *See infra* note 3.

### III.    CONCLUSION

For these reasons, the Court wholly **DENIES** DE 168.

This the 11th day of June, 2020.

Signed By:
*Robert E. Wier* /s/ REW
United States District Judge